Sarah A. Moore, Ella S. Whiton, Frederick W. Dauchy, Agnes Maxwell, Mary Maxwell, Ada S. Maxwell and Sarah A. Maxwell, Plaintiffs, *v.* George M. Henderson, Defendant.

(Supreme Court, Kings Special Term, March, 1917.)

Deeds — cloud on title — removal of — restrictive covenants in deeds — equity — actions — mortgages — Code Civ. Pro. §§ 1638, 1639.

Restrictive covenants in a deed of conveyance created for the benefit of property retained by the grantor are enforcible only by him or his grantees who owned the property benefited by the covenant against the owners of the property burdened thereby.

Restrictive covenants entered into by various grantees pursuant to a general plan, on the theory of mutuality, are enforcible by the several grantees each against the other.

S, the owner of a plot of land, subdivided the same into lots and in every deed affecting an interior lot, described by metes and bounds, the grantee covenanted that no building erected thereon should be situated less than twenty feet from the street; that no dwelling house should be erected on the lot of a value less than $5,000; that but one building should be erected on the lot and that no building of any kind should be erected thereon except a private dwelling, and each deed expressly stated the covenants should run with the land. Both of the corner lots were conveyed by S free and clear of any such restrictions and about two years after the erection of an apartment house on one of them, without objection from those who naturally would be most concerned, the grantee of the other corner lot, together with owners of certain of the interior lots, brought an action under sections 1638, 1639 of the Code of Civil Procedure to have the restrictive covenants canceled and removed upon the theory that plaintiffs and their predecessors in title were deceived into believing that S intended to restrict both the inside and corner lots. *Held,* that as it appeared that all that S did was to restrict the inside lots for the benefit of the remainder of his property the restrictive covenants were valid and binding and that the relief asked could not be granted as against the protest and objection of the holder of a mortgage on said apartment house.

Action in equity to remove a cloud on title.

Frederic N. Gilbert for plaintiffs.

George C. Case for defendants.

Manning, J.    This action is one in equity and was
called for trial at the June, 1916, term, being No.
3264 on the calendar.  The parties then stipulated that
the case might be marked for submission and that they
would take the proofs at their own convenience.   The
record is now complete and under date of February 17,
1917, it is submitted by the parties with a consent that
each and all of the objections stated upon the record
are  to be considered withdrawn, and that the evidence
produced by each side may be considered by the court
without passing upon any of such objections, except
the objection regarding the admissibility of a resolu-
tion of the board of estimate and apportionment,
adopted July 25, 1916, and the acts of the legislature
authorizing such resolution.

The plaintiffs bring the action pursuant to sections
1638 and 1639 of the Code of Civil Procedure for the
purpose of removing what they assert is a cloud upon
the title to certain real property owned by them.

The controversy arises out of and concerns certain
restrictive covenants affecting the plaintiffs' lands,
which were heretofore, and in the month of April,
1893, conveyed to one John E. Searles, who thereafter
imposed the restrictions, the validity of which is now
the subject of judicial inquiry in this law suit.

The title of Searles became vested in him by deeds
from two grantors; namely, Henrietta Douglas, who
on April 20, 1893, conveyed to him the plot of land on
the north side of Newkirk avenue, being now known
as lots 1 to 23 both inclusive, and Charles E. Crehan,

Supreme Court, March, 1917.          [Vol. 99.

who on April 26, 1893, conveyed to him the plot on the south side of Newkirk avenue, now known as lots 24 to 46 both inclusive. These numbers are taken from a map of the whole property which Searles caused to be made, but this map appears not to have been filed in the engineer's office in Kings county until December 3, 1914, over twenty-one years after Searles had acquired the title, and in all the sales made by Searles no reference is made to this map, it affirmatively appearing that the various lots sold by him were described by metes and bounds and not by lot numbers.

Searles undoubtedly purchased the property for investment and development purposes, and shortly after he became seized of the fee he divided the plot into sections or blocks and then subdivided each block into lots undoubtedly with care and foresight, and as the blocks were not exactly square in area, and being obliged to allow for certain intersecting streets, his plan resulted in producing forty-six lots, the interior ones twenty-five feet in width, by the depth of the property, which may be termed regular or inside lots, and certain corner lots which are irregular and unequal in size and character. He employed real estate agents to sell the property and the map he concededly had prepared was used and referred to in making some of the various sales. This map contains what is no doubt a carefully plotted survey of the entire tract, and upon the back thereof is printed the following: " The choicest building sites in Flatbush, with water, sewer and gas, 35 minutes from the Bridge by Flatbush Avenue Electric Cars. Large shade trees on every lot. Carefully Restricted."

The first sales made by Searles embraced two inside lots numbered 14 and 15, and were sold free of any restrictions, save a general nuisance clause, which was on a portion of the property when Searles bought it.

These two lots were sold on September 14, 1893, and it appears from the evidence that the sale was merely made to stimulate the enterprise — I take it that the financial part of the transaction was really taken care of by Searles himself. Searles evidently had in mind, so far as the interior lots were concerned, that he would make a form of restriction which would be uniform and beneficial, not only to the interior plots themselves, but in the nature of things would help his corner lots, and so, the proof shows that in every deed, and in fact in the contracts of sale, which he thereafter made affecting any interior lot, there were inserted the following restrictive covenants:

" That no building to be erected on said plot of ground shall be situated less than twenty feet from Newkirk Avenue;

" That no dwelling house shall be erected on said plot of ground of a value less than Five thousand dollars;

" That but one building shall be erected on said plot, it being understood, however, that this covenant shall not interfere with reconstruction in case of destruction by fire;

" That no building of any kind shall be erected except a private dwelling, as above covenanted, and a private stable; said stable to be situated on the northerly (or southerly, as the case might be) boundary line of said plot above described. This covenant to be construed as a covenant running with the land," which are known as the Searles covenants, and the various purchasers, including the plaintiffs, took their deeds with full knowledge of the fact that such restrictions were upon the lands purchased by them.

Searles never placed or created any restrictions upon the corner lots and the same are now, and always have been, free and clear of any such restrictions. The

plaintiff Sarah A. Moore purchased one of the corner lots over twelve years ago, namely, on April 29, 1904, and must then have had personal knowledge that the corner lots were not restricted, for the deed to her does not contain the Searles restrictions, and the proof further shows that nearly sixteen years have elapsed since Searles made his transfer of the corner lots free from any restrictions, and nearly two years have elapsed since the erection of an apartment house on lot No. 1 without any objection being made by those who would naturally be most concerned.

The plaintiffs now seek to have the so-called Searles restrictions canceled and removed from their property upon the theory that they and their predecessors in title were deceived into believing that Searles intended to restrict the whole property, inside lots and corner lots too. They contend that the covenants should be discharged for the reason that the oral statements and the representations on the map established this restricted community which has been violated by owners of the corner plots and hence the neighborhood has changed. They attempt to support this contention on the theory that Searles had in mind a general building scheme in regard to the development of his property shown on the map, and to make out of the same a section of single family detached houses costing not less than $5,000 each, set back twenty feet from Newkirk avenue. The further assertion is made that there has been a complete change in the character of the property on the Searles map, surrounding the properties of the plaintiffs, from a residential section of single family dwellings to that of an apartment house section, and that the object of the restrictions which the plaintiffs covenanted to observe has ceased to exist.

The defendant maintains and contends that the

restrictive covenants in question are valid and existing, and that restrictions could not be placed upon the corner property by oral representations. Further, that the Searles covenants were made for the benefit of the corner plots which he retained, and that plaintiffs took title to their property with knowledge and notice of the conditions and cannot now ask to be relieved. And, lastly, that there has been no change in the character of the locality that would warrant a court of equity decreeing that the covenants should be removed.

Many of the property owners and holders of interests in the restricted plot have either consented to the cancellation of the restrictions or permitted judgments to be entered against them canceling the same, but the defendant herein has not consented and has not been a party to any action or judgment, and, hence, is not bound thereby.

On May 12, 1899, lot No. 1 was sold to Benjamin F. Stephens, and did not contain the Searles covenants. It was subsequently on June 1, 1910, conveyed by Annie W. Stephens as executrix of the last will and testament of Benjamin F. Stephens, deceased, to Wilmot Y. Hallock, and thereafter conveyed by Hallock to George C. Case, by deed, dated June 4, 1910, and then conveyed by Case to Frank M. McCurdy, Company, Inc., on February 16, 1914, and thereafter by the McCurdy Company to the Louisville Realty Company on March 16, 1914. The Louisville Realty Company executed a mortgage for $65,000 to the Lawyers Mortgage Company, which was subsequently assigned to the Brooklyn Trust Company, and a second mortgage for $23,000 to the Frank M. McCurdy Company, Inc., which was thereafter assigned to George C. Case, and by him assigned to the defendant, George M. Henderson, and his interest in the property is now repre-

sented by this mortgage. He argues that the effect of a judgment or decree canceling the restrictions upon the interior lots would result in these lots being placed on the market and made available for the erection of apartment houses, and as a consequence the building upon which he now has a second mortgage would be depreciated in value in the event of the erection of other apartment houses, and as a natural result his security must of necessity become impaired, but he is willing to consent to a waiver of the restrictions if the plaintiffs will indemnify him against any loss he may sustain.

I am inclined to the belief that the position assumed by the defendant concerning the validity of the Searles covenants is the correct one, and that the plaintiffs have not sustained the burden essential to enable a court of equity to cancel the said restrictions.

It is true that the record contains some oral declarations tending to support the plaintiffs' theory, but the picture presented by the surrounding circumstances and the facts disclosed by the map exhibited to purchasers of the interior lots are against the probability of such oral representations having ever been made in the language claimed. It conclusively appears from an inspection of the map in question that the size of the corner lots, and the irregularity of their formation and dimensions, render them entirely unsuitable for single detached family dwellings. On the contrary, it is apparent that they are more suitable and better adapted to other purposes. For example looking at the two corner lots on Ocean avenue, numbered 1 and 46 on the map, if a single detached dwelling were built on each of these lots fronting on Newkirk avenue, and the owner should erect a stable on the boundary line as permitted by the fourth of the " Searles covenants," such stable

would be parallel with or fronting on Ocean avenue, and for all time to come would be in full view of the passers-by on what has become the finest residential street in Flatbush. The same would be true of a single dwelling facing on Newkirk avenue, erected on the other corner lots, and thus, in each instance, the stable would be in full view of, and but a few feet from, the side street. It is scarcely conceivable that such a plan of improvement was ever contemplated by a shrewd and far-seeing business man such as John F. Searles is admitted to have been, and the probability of the result, so plainly apparent, more than offsets the oral testimony as to these representations. Further than this there is direct evidence in the case that Searles declared that the covenants were for the benefit of the corner lots which he was not then selling.

It seems to me that these covenants fall within the class where the courts have held that when the covenant is intentionally exacted by the grantor from a grantee "presumptively or actually, for the benefit and protection of contiguous or neighboring lands which the former retains" such a covenant runs with the land (in the case at bar it is so expressed); and is enforcible by the grantor or his assigns in favor of the property benefited by the covenant and against the property burdened by it. *Francis* v. *Ziering,* 128 App. Div. 253; *Walker* v. *McNulty,* 19 Misc. Rep. 701; *Atlantic Dock Co.* v. *Leavitt,* 54 N. Y. 35, 42.

Such a restrictive covenant need not be made pursuant to or in furtherance of any general plan or scheme adopted by the owner, but it may be required from the grantee with the intention and for the purpose of protecting the land retained by the grantor. *Smith* v. *Graham,* 161 App. Div. 803, 805; affd., 217 N. Y. 655, on opinion below. See, also, *Korn* v. *Campbell,* 192 N. Y. 490, 495; *Silberman* v. *Uhrlaub,* 116

App. Div. 869, 872; *Phoenix Co.* v. *Continental Ins. Co.,* 87 N. Y. 400, 408.

As these decisions are read it is apparent that the difference between restrictive covenants created for the benefit of property retained by the grantor and restrictive covenants entered into by various grantees, pursuant to a general plan or scheme, is this, the former are enforcible only by the grantor, or his grantees, who own the property benefited by the covenant, against the owners of the property burdened by the covenant; the latter are, on the theory of mutuality, enforcible by the several grantees, each against the other. *Korn* v. *Campbell,* 192 N. Y. 490, 495.

In the case at bar, the covenants are not sought to be enforced by the grantees of the interior lots, and hence it is not necessary, therefore, to determine whether or not a clearly defined scheme or plan of improvement existed, which was disclosed to intending and prospective purchasers. It might be possible, however, from the evidence in this case, to find a general scheme of improvement, but, if so found, it would involve the restricting of interior lots to single detached dwellings.

There is no proof here that Searles ever intended to restrict all the lots — in fact, proof is to the contrary. All that he did was to restrict inside lots and this was evidently done for the benefit of the remainder of his property, and, hence, I am of the opinion that the restrictions are valid and binding and cannot be canceled as against the protest of the defendant who objects to such cancellation. Judgment is therefore rendered for the defendant.

Judgment for defendant.